IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EARNEST MIMS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 18-cv-00264 |
| THE BOEING COMPANY, MICHAEL FORD, OZZIE PIERCE, LISA MCCOY, and PAULA NOBLE, | ) Judge John J. Tharp, Jr. ) ) ) |
| Defendants. | ) |

**ORDER**

For the reasons set forth in the statement below, Defendant Boeing's partial motion to dismiss the amended complaint [74] is granted in part and denied in part. The individual defendants' motions to dismiss ([97], [99], [100], and [101]) in which they join Boeing's motion and incorporate its arguments by reference, are granted in part and denied in part for the same reasons. Mims' FMLA retaliation claim, and his retaliatory discharge claim pursuant to the Employee Sick Leave Act, are dismissed. His claim for intentional infliction of emotional distress survives. A telephonic status hearing is scheduled for July 13, 2022 at 9:15 a.m. Dial-in information will follow in a separate docket entry.

**STATEMENT**

For the purposes of a motion to dismiss pursuant to Federal Rule 12(b)(6), the court accepts all allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.

Plaintiff Earnest Mims was previously an employee with the Boeing Company; Michael Ford was his direct supervisor. Amended Complaint ¶ 8, ECF No. 73. Mims took FMLA leave in May 2015 due to anxiety and depression, *Id.* at ¶ 18, though the precise dates of his leave are unclear. On June 25, 2015, Boeing sent an email to Ford stating that it had approved Mims' leave for May 6 to May 11, 2015. *Id.* at 26. Another email sent on the same day characterized the leave as "intermittent" and said that Mims had requested 24 hours of FMLA for each of 5/6, 5/7, 5/8 and 5/11/15. It is unclear if Mims returned from these days of approved leave before taking a longer stint of leave, or if he instead remained away from work beginning on 5/6. In any event, on July 8, 2015, Boeing emailed Michael Ford saying that Mims' request for FMLA leave had been approved, though no dates are provided. Then, on October 13, 2015, Paula Noble (a Boeing HR employee) informed Michael Ford that Mims had requested an extension for his leave. *Id.* at ¶ 30. On November 9, 2015, Mims was approved for long-term disability benefits, *Id.* at ¶ 31, and on November 12, for a two-year leave of absence extending until November 10, 2017.

When Mims began taking FMLA leave in May 2015, the complaint alleges, Ford, along with Boeing employees Ozzie Pierce, Lisa McCoy, and Paula Noble, began cooking up a pretext

to fire Mims because they were peeved at his absence.[1] On May 21, 2015, shortly after Mims had requested FMLA leave, Lisa McCoy began soliciting documents to "manufacture a record of poor performance in an attempt to justify the termination of Mims." *Id.* at ¶ 20. On May 29, 2015 Ford sent an email to McCoy with the subject line "Re: Performance Issues—Next Steps," though the content in the body of the email was unavailable in discovery because the first sentence read "We need to ensure attorney client privilege on these communications." *Id.* at ¶ 21. The complaint references a few other emails that indicate Ford's and others' annoyance, most notably one that Noble sent in response to Mims' October 14, 2015 request to extend his leave: "Thanks Michael. The question here is how long is this allowed to go on…." *Id.* at ¶ 30.

Fast forward two years. Mims contacted Boeing in October 2017 about concluding the leave of absence Boeing had approved back in 2015. *Id.* at ¶ 30. He began discussing his return and accommodations with Boeing's Absence Management office; these discussions culminated in a phone call with Pam Zednick, who informed Mims that some accommodations would be provided and that he should return to work on November 10, 2017. In the background, Mims alleges, Ford, Pierce, and McCoy were "plotting behind his back." *Id.* at ¶ 40. When he returned, Mims was met by a Boeing HR employee and a security guard, who informed him that Ford had decided not to have him back because he and Mims had a "history". *Id.* at ¶¶ 41-46. That history, Mims alleges, includes Ford's desire to fire him for his disability and his use of FMLA leave, among other things. *Id.* at ¶ 47.

Mims filed this action on January 18, 2018. After the conclusion of discovery, Mims filed this Amended Complaint, which raises several claims organized as counts. In counts I and II, Mims alleges that Boeing discriminated against him in violation of the ADA and in violation of the Illinois Human Rights Act (IHRA). In Count III Mims alleges retaliation in violation of the FMLA. Count IV claims that Boeing intentionally inflicted emotional distress on Mims, and count V is a claim for retaliatory discharge in violation of Illinois' Employee Sick Leave Act.

In response to the filing of the Amended Complaint, Boeing filed this motion to dismiss, seeking to dismiss counts III, IV and V. The individual defendants—Paula Noble, Michael Ford, Lisa McCoy, and Ozzie Pierce—subsequently joined Boeing's motion.

**FMLA Retaliation**

Mims alleges that Boeing "used the fact that he'd taken protected leave against him," and that his taking FMLA was a substantial motivating factor in his termination, which violates the FMLA's antiretaliation provision. Pl.'s Resp. 2, ECF No. 82; 29 U.S.C. § 2615(a)(2). Boeing contends that Mims' claim for FMLA retaliation must be dismissed because he remained unable to work after his twelve-week entitlement, and thus the FMLA no longer protected him. Mot. to Dismiss 2-3, ECF No. 74. Mims responds that he is not claiming that Boeing was required to reinstate him, but rather that the fact he took FMLA was a factor in his termination, and it was unlawful to retaliate by terminating him.

---

[1] Ozzie Pierce's role within Boeing, other than being on the receiving end of several emails, is not specified in the complaint. Am. Compl. ¶ 9. McCoy and Noble work in Boeing's Human Resources department. *Id.* at ¶¶ 10-11.

In *Breneisen v. Motorola, Inc.*, the Seventh Circuit, dealing with a similar situation involving long leaves of absences an employer extended beyond the twelve weeks guaranteed by the FMLA, held that "[w]hen serious medical issues render an employee unable to work for longer than the twelve-week period contemplated under the statute, the FMLA no longer applies." 656 F.3d 701, 705 (7th Cir. 2011). In *Breneisen*, the plaintiff had taken his FMLA leave and returned to work; several months later, his medical issues persisted and Motorola granted him another leave of absence in excess of the FMLA requirement. Breneisen claimed that after his second leave of absence, his employer harassed him and exacerbated his medical condition, thus retaliating against him in violation of the FMLA. The Seventh Circuit rejected the idea that such an "exacerbation" claim was cognizable under the FMLA, and further held that employees who remain unable to work at the conclusion of their FMLA leave are no longer protected by the FMLA. *See also Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426, 440 (7th Cir. 2021) (citing *Breneisen* and observing that if employee had been unwilling or unable to work after the conclusion of twelve weeks, FMLA would not have protected him, but affirming jury verdict that found his employer actively thwarted him from timely returning).

Here, Mims alleges that he took two years of leave in addition to his FMLA leave for anxiety and depression, meaning that he was unable to return to work after the end of the statutory period. The FMLA thus does not protect him. *See Gomez v. Dynamic Mfg., Inc.*, 2013 WL 3270660 (N.D. Ill. 2013) (holding that employee who was unable to work after twelve weeks was "no longer subject to the FMLA's protections."); *Scheidt v. Floor Covering Assocs., Inc.*, 2018 WL 4679582 (N.D. Ill. 2018) (rejecting FMLA claim where employee had not been cleared to return to work by physician at the conclusion of FMLA period). Even if he could prove his allegation that his employer began creating a pretext to fire him while he was on FMLA leave, the fact that he remained unable to work removes him from the class that benefits from the FMLA's "clearly defined protections." *Breneisein*, 656 F.3d at 701. The purpose of the FMLA is "to protect employees from adverse actions by their employers during finite periods when short-term personal or family medical needs require it," not to protect additional leaves of absence. Were the law otherwise, employers would be disincentivized from offering any discretionary leave of absence beyond the requirements of the FMLA—any such extension would effectively expand the statutory leave period provided by the FMLA, and employers might be less generous for fear of incurring FMLA liability for not holding positions indefinitely.

**<u>Intentional Infliction of Emotion Distress</u>**

Mims' claim for intentional infliction of emotional distress (IIED), however, survives Boeing's motion to dismiss. Boeing first argues that Mims failed to state a claim for IIED because his allegations are based on privileged litigation materials. Alternatively, Boeing contends, Mims' IIED claim is preempted by the Illinois Human Rights Act (IHRA). Both arguments lack merit.

Boeing appears to read Mims' claim thus: Mims was emotionally distressed upon reviewing the discovery that showed Ford and others plotting to terminate him. Mot. to Dismiss at 6; Reply at 4, ECF No. 83. The law does not recognize a cause of action for emotional distress caused by litigation, Boeing says, so this claim must be dismissed. MTD at 4-5. Mims responds that Boeing misconstrues his claim: Mims alleges that Boeing led him to believe that he would be

3

rehired and negotiated accommodations with him for several months in a deliberate attempt get his hopes up, when it never had any intention to hire him back. Resp. at 3-4. Boeing then invited him back to resume his old job so that it could humiliate him by unceremoniously showing him the door. *Id.*; Am. Compl. ¶ 74. Indeed, Boeing's presentation of Mims' claim is perplexing. While it is true that Mims is using new material from discovery to make this claim, he nowhere alleges that reviewing these emails during litigation caused his emotional distress; rather, he appears to reference discovered materials to allege that Boeing acted intentionally. This is an unsurprising use of materials unearthed in discovery and Plaintiff's claim is not barred by any litigation privilege.

Boeing's IHRA preemption argument is more consequential than its argument about privilege, but fails nonetheless. First, preemption is an affirmative defense, and plaintiffs need not anticipate or plead around affirmative defenses. *See, e.g., Bausch v. Stryker Corp.*, 630 F.3d 546, 561-62 (7th Cir. 2010). More importantly, Mims' allegations regarding IIED do not implicate the legal duties imposed by the IHRA, and so the claim is not preempted by the IHRA.

The IHRA provides that "no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-11(D). It further defines a civil rights violation as including employment discrimination based on disability. 775 ILCS 5/2-102(A). The Illinois Supreme Court holds that whether a court "may exercise jurisdiction over a tort claim depends on whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Act itself." *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 35 (Ill. 1997). "[T]he concrete question to ask is whether the plaintiff states a valid common-law claim without needing to rely on the rights and duties created by the Human Rights Act[.]" *Richards v. U.S. Steel*, 869 F.3d 557, 564 (7th Cir. 2017) *citing Maksimovic*, 687 N.E.2d at 24. The IHRA preemption inquiry "rest[s] on an examination of legal duties, not on the factual overlap between the two claims." *Id.* at 564 (internal quotation marks and citations omitted).

Boeing argues that Mims' IIED claim cannot be extricated from duties created by the IHRA because the claim relies on Boeing's duty under the IHRA not to terminate Mims for his disability. Mims responds that he can state his claim independently of any claim for disability discrimination. He alleges that in the months before his leave of absence concluded, he was led on and brought back to Boeing only to be fired in a humiliating manner. Mims argues that his claim for emotional distress doesn't rely on the fact of, or reason for, his termination, but rather the way it was carried out. His claim under the Human Rights Act is that Boeing terminated him for his disability; his IIED claim survives even if the termination was ultimately lawful—a company may lawfully fire someone, but (to use Mims' alleged scenario) it would still plausibly inflict emotional distress by staging the termination in a manner calculated to humiliate the employee.

The Court agrees. Mims' claim that he was terminated for being disabled in violation of the IHRA and his claim that he was terminated in an outrageous manner have superficial factual overlap in the sense that that they both involve his termination. But Mims can state a claim for IIED without reference to Boeing's legal duty not to discriminate based on disability. Even if he were not in a protected class, he could make the claim that Boeing intentionally brought him back just to fire him, and that this conduct was outrageous. The alleged conduct is not offensive only if

based on Mims' disability. *See Davis v. Palos Health*, 2019 WL 214916 (N.D. Ill. 2019) ("Because the described conduct is only offensive based on the Davis' age or race, the IIED claim is inextricably linked to the discrimination claims.").

### Common Law Retaliatory Discharge

Finally, Mims claims that Boeing discharged him in a retaliatory manner, violating Illinois' clear mandate of public policy as expressed in the Employee Sick Leave Act (ESLA), 820 ILCS 191/20. To prevail on a claim for retaliatory discharge, Mims must ultimately establish that (1) Boeing discharged him, (2) in retaliation for his activities, and (3) that the discharge violates a clear mandate of public policy. *Walker v. Ingersoll Cutting Tool Co.*, 915 F.3d 1154, 1157 (7th Cir. 2019).

The common law tort of retaliatory discharge is a "limited and narrow" exception to the general rule that employment in Illinois is at-will; one that "seeks to achieve proper balance… among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out." *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374-75 (Ill. 2009). "A matter must strike at the heart of a citizen's social rights, duties and responsibilities before the tort will be allowed." *Palmateer v. Int'l Harverster Co.*, 421 N.E. 2d 876, 878-89 (Ill. 1981). While a public policy may be found in provisions of the state constitution and statutes, "mere citation of a constitutional or statutory provision in a complaint will not by itself be sufficient to state a cause of action for retaliatory discharge." *Fellhaur v. City of Geneva*, 568 N.E.2d 870, 875 (Ill. 1991). Accordingly, the Illinois Supreme Court has only recognized the tort "in two settings: where an employee is discharged for filing, or in anticipation of filing, a claim under the Workers' Compensation Act; or when an employee is discharged in retaliation for the reporting of illegal or improper conduct[.]" *Michael v. Precision Alliance Group, LLC*, 2014 IL 117376 ¶ 30.

In Mims' view, this issue is straightforward—the public policy of Illinois regarding employees' sick leave has been expressed in ESLA, which provides and "[a]n employer shall not deny an employee the right to use personal sick leave benefits in accordance with this Act or discharge… an employee for using personal sick leave benefits." 821 ILCS 191/20. Boeing allegedly retaliated against him by terminating him for taking sick leave. The statute does not provide a remedy, so disallowing plaintiff's claim for retaliatory discharge would relieve Boeing of its obligations under the statute. Boeing argues that Mims' claim does not fall within the narrow classes of claims for which the Illinois Supreme Court has recognized a cause of action for retaliatory discharge, and so must be dismissed.

Boeing is correct that Mims has not alleged a violation of the public policies that Illinois have expressly recognized as supporting a claim for common law retaliatory discharge. This has, in the past, been reason enough for courts in the Northern District to reject such a claim. *Scheidt v. Floor Covering Assocs.*, 2018 WL 4679582 *15 (N.D. Ill. 2018) (holding that employee could not pursue retaliatory discharge claims premised on the Pregnancy Discrimination Act or the Illinois Human Rights Act because the Illinois Supreme Court restricts the tort to these two recognized settings).

5

Of course, that the Illinois Supreme Court has not recognized a cause of action for retaliatory discharge outside these contexts does not necessarily mean that it would not do so. But its reluctance to extend the tort beyond those two narrow setting in the decades since Illinois recognized the tort in *Kelsay v. Motorola*, 384 N.E.2d 353 (Ill. 1978) counsels caution. Any doubt as to whether the Illinois Supreme Court would do so in this case is settled, in the Court's view, by the Illinois Appellate Court's recent decision in *DiPietro v. GATX Corporation*, 2020 IL App (1st) 192196. While that case dealt with a somewhat different claim under ESLA—the employee there claimed she had been fired for complaining about how her employer administered its leave program—the court's reasoning shows how Illinois courts understand the public policy mandate underlying ESLA. The statute requires employers to extend sick leave benefits to employees who need time away to care for family on the same terms as it offers leave to employees who are sick themselves; this is not the public policy Mims seeks to vindicate.

DiPietro had complained to her employer about its policy that calculated leave in four-hour increments—because she spent time away from work caring for a relative in increments smaller than four hours, DiPietro argued, she was charged for hours that she did not use and was thus denied leave in violation of the act, and when she was terminated for complaining about the policy, her termination was a violation of the act. *Id.* at ¶¶ 4-6, 42. Those facts are admittedly distinguishable—DiPietro claimed that her employer's leave policy violated the act and that she was fired for challenging the policy; Mims says he was fired for using sick leave and that this violates the act. But in rejecting DiPietro's claim, the appellate court explained that the Employee Sick Leave Act "only requires employers to allow employees to utilize their sick leave to care for family members on the same terms that they are permitted to use sick leave for their own illness." 2020 IL App (1st) 192196, citing 820 ILCS 191/10(a). While the court in *DiPietro* rejected the premise that the employer denied the plaintiff leave, it reasoned that even if her employer had denied leave, such a denial would only violate the act if an employee using sick leave to care for family members were "singled out for different treatment." Here, Mims does not allege that he was singled out for different treatment because he was fired for using leave to care for a family member, rather, he claims he was terminated for using two years of leave for his own anxiety and depression. In other words, he does not allege a violation of any clear mandate of public policy underlying ESLA.

This does not necessarily leave him without a remedy; the statute contemplates that complaints for violations of ESLA will be brought to the Illinois Department of Labor. *See* 820 ILCS 191/20. The availability of other remedies is relevant in considering whether a claim for retaliatory discharge is necessary to vindicate public policy. *See Fellhauer v. City of Geneva*, 568 N.E.2d 870, 876 (Ill. 1991) (reasoning that allowing a claim for CLRD was not necessary because statute contained other deterrents to unlawful conduct); *People v. Grever*, 856 N.E.2d 321, 337 (Ill. 2006). The Court notes, however, that the form complaint on the Department of Labor's website is solely concerned with whether an employee was denied leave he or she requested to care for a family member, which buttresses the notion that the public policy at issue involves

discrimination against those who need leave to care for family, rather than one entitling employees to leave generally.[2]

It also bears emphasizing that the Act does not require employers to extend any sick leave at all—it is a non-discrimination statute, not a leave entitlement. Of course, employers offer sick leave because the labor market, not the law, requires that they do so to attract and retain talent. Expanding liability to cover all sick leave under this statute could change how sick leave benefits are valued in the labor market—any termination over absenteeism would pose a risk of becoming an ESLA retaliatory discharge suit, which would in turn increase the risks and costs of granting any sick leave, leading employers to be stingier with this benefit. The law requires a balancing among the employee's interest in earning a livelihood, the employer's interest in running a profitable business, and society's interest in having its policies carried out. *Turner*, 911 N.E.2d at 375. Illinois courts recognize claims for retaliatory discharge as a narrow exception to the general rule that employment is at-will; expanding liability as Mims urges would impinge on that policy of at-will employment by turning every sick leave request into a litigation risk.

\* \* \*

Accordingly, Mims' claim for FMLA retaliation is dismissed, his IIED claim survives, and his claim for retaliatory discharge in violation of ESLA is dismissed. A telephonic status hearing is set for July 13, 2022 at 9:15 a.m.

Date: June 28, 2022

John J. Tharp, Jr.
United States District Judge

---

[2] "Employee Sick Leave Act Complaint Form," available at https://www2.illinois.gov/idol/Laws-Rules/CONMED/Pages/Employee-Sick-Leave-Act.aspx (last accessed on February 16, 2022)